

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
03/05/2008

|  |  |  |
|---|---|---|
| In re: | § § § § § § § § | Case No. 05-90374 |
| WILLIAM ALLEN PARSLEY, | | |
| Debtor | | Chapter 13 |

**MEMORANDUM OPINION ON SHOW CAUSE ORDERS OF**
**FEBRUARY 12, 2007 AND MAY 18, 2007**

**I.      Introduction**

The matter before this Court began with a routine motion to lift stay, but has spiraled into a lengthy ordeal which has cost the parties substantial time, attorneys' fees, and costs. Over one year ago, on February 6, 2007, the Court sought a simple answer to a simple question—why was a motion to lift stay being withdrawn? The movant's attorney, rather than answer the question truthfully by admitting that the motion was based upon an incorrect payment history, attempted to conceal the truth from the Court—that the motion should have never been filed. This rather narrow issue precipitated an expansive proceeding. During several hearings over the past year, the Court received evidence on a wide range of misconduct beyond this initial misrepresentation.

The parties are a mortgage loan servicer and its two law firms: (1) Countrywide Home Loans, Inc. (Countrywide), the loan servicer for Fannie Mae, the mortgagee of the Debtor's home loan; (2) McCalla, Raymer, Patrick, Cobb, Nichols & Clark (McCalla Raymer), the national law firm to which Countrywide referred the file after deciding to seek relief from the automatic stay; and (3) Barrett, Burke, Wilson, Castle, Daffin & Frappier, L.L.P. (Barrett Burke), the Texas law firm which McCalla Raymer chose to draft, file, and prosecute the motion to lift stay. Their collective conduct caused

this Court to issue two Show Cause Orders. This Memorandum Opinion discusses how their actions in the case at bar have shown a disregard for the professional and ethical obligations of the legal profession and judicial system.[1]

## II.   Background of the events preceding the First Show Cause Order

### A.   The importance of homesteads in Texas

In Texas, homesteads are sacrosanct. *In re McDaniel*, 70 F.3d 841, 843 (5th Cir. 1995). Indeed, when it first took effect, the Texas State Constitution expressly forbade forced foreclosure sales on homesteads except for those creditors who held purchase money liens, mechanics' liens, or tax liens. *Magallanez v. Magallanez*, 911 S.W. 2d 91, 94 (Tex. App.—San Antonio 1995) (citing TEX. CONST. art. XVI, § 50; TEX. PROP. CODE ANN. § 41.002 (Vernon 2006)).[2]  The public policy of Texas' liberal protection of homesteads is "to protect citizens and their families from the miseries and dangers of destitution." *In re Bradley*, 960 F.2d 502, 505 (5th Cir. 1992) (quoting *Franklin v. Coffee*, 18 Tex. 413, 415-16 (1857)); *In re Sorrell*, 292 B.R. 276, 280 (Bankr. E.D. Tex. 2002).

### B.   The Court's concern over withdrawn motions to lift stay on homesteads of debtors

Given this important, long-standing policy protecting homesteads in Texas, this Court makes every effort to ensure that motions to lift stay seeking to foreclose on homesteads contain accurate information regarding payments made by the debtor.  When a debtor's homestead is the subject of a withdrawn motion to lift stay, this Court typically inquires why the movant wants to withdraw the

---

[1] *See In re Maisel*, 378 B.R. 19, 20-21 (Bankr. D. Mass. 2007) ("Unfortunately, concomitant with the increase in foreclosures is an increase in lenders who, in their rush to foreclose, haphazardly fail to comply with even the most basic legal requirements of the bankruptcy system.")

[2] In 1997, the Texas Constitution was amended to allow for forced sales where the lien was created through a qualifying home equity loan. TEX. CONST. art. XVI, § 50(a)(6)(A); *see also Box v. First State Bank*, 340 B.R. 782, 784 (S.D. Tex. 2006).

motion. In some cases, there is an entirely reasonable explanation. For example, if, between the date of the filing of the motion and the date of the hearing on the motion, the debtor has cured the defaults that were the basis of the motion, it makes sense for the movant to withdraw the motion. Conversely, the reason for withdrawal is suspect if, after the date of the filing of the motion, the movant discovers that the motion contains inaccurate factual allegations about the debtor's default. It is also reasonable to withdraw the motion under these circumstances, but it is neither fair nor equitable for the movant to charge the debtor for the attorney's fees and costs incurred in connection a motion that was deficient when filed.

Unfortunately, such fee and cost shifting sometimes occurs without the movant informing the Court or the debtor. *See Sanchez v. Ameriquest Mortgage Co. (In re Sanchez)*, 372 B.R. 289 (Bankr. S.D. Tex. 2007); Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, U. of Iowa Legal Studies Research Paper No. 07-29, Nov. 6, 2007, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1027961.   The debtor only discovers the additional obligation months or years later when, believing he has paid all of the monthly payments on the note, he learns that the debt is not entirely retired because these unfamiliar fees and costs, plus interest that has accrued thereon, remain unpaid. It is just such a scenario which this Court seeks to prevent by inquiring why a movant is withdrawing its motion to lift stay on a debtor's homestead.

If counsel for the movant concedes that the motion should not have been filed because it contained inaccurate allegations about payments and further represents that the movant will not shift the fees and costs to the debtor, this Court will typically sign the order allowing withdrawal of the motion and take no further action. However, if counsel for the movant does not concede that the

motion contained inaccurate factual allegations, then this Court will inquire about the original basis

for filing the motion to lift stay and why the movant is seeking to withdraw the motion.

### C.    The January 23, 2007 preliminary hearing on Countrywide's motion to lift stay

In the case at bar, the Court was faced with a motion to lift stay which the Debtor claimed

contained factually inaccurate allegations about his payment history.  Countrywide, the servicer of

the Debtor's mortgage, retained McCalla Raymer, whose offices are in Roswell, Georgia. McCalla

Raymer then sent the Debtor's file to Barrett Burke's Houston office with a request that Barrett

Burke file a motion to lift stay, which Barrett Burke did on December 29, 2006 (the Motion).

[Docket No. 26.]

At the preliminary hearing on January 23, 2007, Warren Lee (Lee) appeared on behalf of the

Debtor and announced that, based upon payment information provided by the Debtor on the previous

day, the Debtor's counsel of record, Christopher Morrison (Morrison), had filed a response opposing

the Motion (the Response).  [Docket No. 27.]  According to Lee, the Response was based on

information which the Debtor himself had received from Countrywide the previous day.   The

Response states:

> "The mortgage payment history, which is attached to the Movant's Motion for Relief,
> reflects that the Movant inaccurately applie[d] the first post-petition mortgage
> payment (received 11/09/2005) to the pre-petition arrears, rather than the November
> 2005 payment (see attached pay history).  Furthermore, the attached mortgage
> payment history does not reflect the payment received by Movant on May 5, 2006 as
> shown on the Movant's own year-end 'transaction history for 2006.'"

One of Barrett Burke's attorneys, Yvonne Knesek (Knesek), also appeared at the preliminary

hearing and informed this Court that she had just seen the Response a few minutes prior to the

hearing.  She stated that she would need to verify the payment history provided by the Debtor, but

4

despite the misapplication of the Debtor's monthly payments, he was "still delinquent." [January 23, 2007 Hr'g Tr. 2:4-10.] Lee and Knesek represented that the parties wanted more time to ascertain the exact amount of the Debtor's arrearage; accordingly, they requested that the preliminary hearing be passed to a final hearing. The Court granted this request and set a final hearing for February 6, 2007.

### D.    The February 6, 2007 final hearing

At the final hearing on February 6, 2007, a different Barrett Burke attorney, Walter Thurmond (Thurmond), appeared for Countrywide and announced that Countrywide wished to withdraw the Motion.[3] This Court, mindful that the Debtor's response set forth that the payment history was inaccurate, inquired whether the Motion contained allegations about the Debtor's payment history that were "just flat-out wrong." [Feb. 6, 2007 Hr'g Tr. 4:2-7.] Thurmond responded by saying that, "From what I have read in our system this morning and what I could tell from this, *the answer is it was a good motion.*" [Feb. 6, 2007 Hr'g Tr. 4:8-10 (emphasis added).] When this Court informed Thurmond that it had concerns that the Motion contained factual inaccuracies, Thurmond then represented to the Court that he would "check when I go back and see what the deal was with it." [Feb. 6, 2007 Hr'g Tr. 4:20-21.] Thurmond never informed the Court of the results of his research on the Motion. The Court was therefore left with two distinct impressions: (1) the Motion contained inaccurate allegations about the Debtor's payment history;

---

[3] At the final hearing, neither Morrison nor Lee appeared for the Debtor because, according to Thurmond, Morrison knew that Barrett Burke was going to inform the Court that Countrywide wished to withdraw the Motion. [Feb. 6, 2007 Hr'g Tr. 3:5-11.] Presumably, Morrison saw no need to attend this hearing because he knew there would be no testimony and therefore his services would not be needed.

and (2) Thurmond did not want to own up to these false allegations, and hoped that this Court would forget the whole matter.

### III.    The First Show Cause Order

Based upon the suspect comments made by Thurmond, this Court issued a show cause order on February 12, 2007 requiring Countrywide and its counsel to appear and show cause why they should not be sanctioned for their conduct relating to the Motion (the First Show Cause Order). [Docket No. 29.]  Specifically, the First Show Cause Order stated:

> This Court is concerned that Countrywide and/or its counsel have caused the Debtor to incur unnecessary legal fees and expenses by filing the [Motion] and then withdrawing it at the eleventh hour because it contained factual inaccuracies that Countrywide and its counsel should have discovered prior to the filing of the Motion if proper attention [had] been given to the Debtor's mortgage payment history and appropriate procedures.

> [Docket No. 29.]

The hearing on the First Show Cause Order was scheduled for March 5, 2007.  The Court required a representative from Countrywide and three individuals from Barrett Burke to appear.  At this point, the Court had not been made aware of the existence of McCalla Raymer and its role in this matter.  As indicated by the language in the First Show Cause Order, the Court was focused on (1) whether misrepresentations were made to the Court that the Motion was factually accurate; and (2) ensuring that the Debtor was not being charged attorney's fees for a motion that should have never been filed.  But for the extremely thorough investigation by the Office of the United States Trustee (UST), the Court may never have become aware of the numerous other issues discussed herein.

6

**A.     The role of the United States Trustee in this matter**

Prior to addressing the events of the March 5, 2007 hearing on the First Show Cause Order, the Court believes it is necessary to discuss the role of the UST–in this case, specifically, and in the bankruptcy system, generally–due to complaints by Barrett Burke, McCalla Raymer, and Countrywide that the UST was overstepping its authority by being so actively involved in this matter.

When this Court issued the First Show Cause Order setting a hearing for March 5, 2007, the Court had no knowledge of the UST's intention to appear and be heard in this matter. The Court assumed that only Countrywide and Barrett Burke would appear at the hearing. Three days prior to the hearing, on its own volition, the UST filed a pleading entitled "Statement of the United States Trustee regarding this Court's Order requiring Countrywide Home Loans, Inc. [and Barrett Burke Wilson Castle Daffin & Frappier L.L.P. attorneys and personnel] to appear and show cause why [they] should not be sanctioned for filing a motion for relief from stay containing inaccurate debt figures and inaccurate allegations concerning payments received from the debtor." [Docket No. 40.] In this statement, the UST encouraged the Court to issue sanctions against Countrywide and Barrett Burke based on a bad faith failure to investigate the factual basis for the Motion. The UST further requested this Court to conduct an examination to determine whether Barrett Burke and/or Countrywide had engaged in similar past behavior. [*Id.*]

On the day of the March 5, 2007 hearing, Barrett Burke filed a Motion to Strike or, in the Alternative, Limit Issues and/or Continue Show Cause Hearing. [Docket No. 43.] In this motion, Barrett Burke asserted that the UST had no standing to participate in the show cause hearing. This Court disagreed and issued a ruling that the UST did have standing. [Docket No. 48.]

7

Notwithstanding this ruling, Barrett Burke, McCalla Raymer, and Countrywide, from time to time during the show cause hearings, questioned the UST's motives. Indeed, in closing arguments, Barrett Burke's counsel noted that in the case at bar, the Debtor himself had not lodged any complaint against Countrywide and its counsel—thereby insinuating that the UST had no business involving itself in the show cause hearing. [Dec. 12, 2007 Tr. 13:5-14:5 and 17:20-25.] The level of vituperation towards the UST merits some discussion of the UST's role in the bankruptcy system.

The UST frequently participates in matters such as objecting to fee applications, prosecuting motions to dismiss cases, prosecuting motions against bankruptcy petition preparers for violations of 11 U.S.C. § 110, objecting to disclosure statements and plans in Chapter 11 cases when these pleadings are legally deficient, and prosecuting objections to discharge in Chapter 7 cases. Although it is uncommon, and possibly unprecedented until recently, for the UST to focus on the conduct of a mortgagee, a servicer, or its counsel in a Chapter 13 case, it does not follow that the UST is outside of its Congressional mandate as suggested by Barrett Burke, McCalla Raymer, and Countrywide.

Statutory law, case law, and legislative history indicate the UST has an extremely broad role in the bankruptcy process. 11 U.S.C. § 307 states that: "The United States trustee *may raise and may appear and be heard on any issue in any case* or proceeding under this title but may not file a plan pursuant to section 1121(c) of this title." (emphasis added). The language in this statute is unambiguous: the UST, on its own, has the right to raise and be heard on any issue of its choosing. *See, e.g., In re Revco, Inc.*, 898 F.2d 498, 499 (6th Cir. 1990) (reversing district court's holding that the UST lacked standing because it had no pecuniary interest at stake, the Sixth Circuit held that the UST had standing to appeal because its role is "protecting the public interest and ensuring that

8

bankruptcy cases are conducted according to law."); *In re Clark*, 927 F.2d 793, 794 (4th Cir. 1991)
(holding that the UST has standing to appeal based on Revco's reasoning that the UST's duty is to
ensure that bankruptcy cases are conducted according to law); *In re Dow Corning Corp.*, 194 B.R.
147 (Bankr. E.D. Mich. 1996) ("One of the United States trustee's principal raisons d'etre is to guard
and protect the bankruptcy system . . . The United States trustee now monitors such activities and
objects *not because parties in interest may be harmed by the action, but merely to protect the
integrity of the system*.") (emphasis added).

Congressional history supports wide-ranging authority for the UST.  In discussing the role
and duties of the UST, the legislative history of the Bankruptcy Reform Act of 1978 stated that:

> They [i.e., the UST] will serve as enforcers of the bankruptcy laws by bringing
> proceedings in the bankruptcy courts in particular cases in which a particular action
> taken or proposed to be taken deviates from the standards established by the proposed
> bankruptcy code . . . The United States Trustee will conduct investigations in
> appropriate circumstances to ensure that participants in bankruptcy cases are not
> avoiding the requirements of the bankruptcy code.

> H.Rep. No. 595, 95th Cong., 1st Sess. 109-10 (1977).

In the case at bar, the UST read this Court's First Show Cause Order and decided to appear
and be heard on the issues raised therein.  In so doing, the UST was well within its authority to
investigate the activities of Countrywide, Barrett Burke, and McCalla Raymer to determine if their
activities undermined the integrity of the bankruptcy system.  The Court would also note that the
discovery conducted by the UST, and its examination of witnesses at the show cause hearings, has
been very thorough and skillful.

In sum, merely because the UST has not previously focused on the practices of mortgagees
in consumer bankruptcy cases does not mean that the UST is prohibited from doing so now.  11

U.S.C. § 307 grants the UST extremely broad standing.  The Court greatly respects the UST's work

in this case and anticipates that the UST will participate in future hearings in this Court.

### B.      The March 5, 2007 hearing on the First Show Cause Order

Three witnesses testified at the March 5, 2007 hearing on the First Show Cause Order: (1)

Felicia Sanov (Sanov), the associate attorney at Barrett Burke who signed the Motion; (2) Lois Ortiz

(Ortiz), the manager of the bankruptcy department at Countrywide; and (3) John Schlotter

(Schlotter), an associate attorney at McCalla Raymer who had knowledge about the Debtor's file.[4]

#### 1.  Felicia Sanov's testimony

Sanov worked as an attorney at Barrett Burke for over four years and has been licensed to

practice law in Texas since 1987.[5]  [March 5, 2007 Hr'g Tr. 18:6-21.]  Sanov stated that McCalla

Raymer had been referring files to Barrett Burke for approximately 15 years and that the volume

ranged from 100-150 files per month; indeed, she testified unequivocally that McCalla Raymer is

"a major client of the firm." [March 5, 2007 Hr'g Tr. 20:15-24; 21:5-6.]  She also stated that

McCalla Raymer referred the Debtor's file to Barrett Burke on December 11, 2006 for the purpose

of filing a motion to lift stay. [March 5, 2007 Hr'g Tr. 20:2-8; 21:21-25.]

On December 29, 2006, Sanov signed the Motion, attached the Debtor's loan history, and

filed this pleading with the Clerk's office.  The Motion alleged that the Debtor had: (1) estimated

---

[4] The Court heard testimony from many witnesses during the numerous hearings on the Second Show Cause
Order.  In order to assist the reader with following the names of the witnesses referenced in this Memorandum Opinion,
the Court has attached an addendum which identifies the witnesses who testified in the case at bar.

[5] On March 5, 2007, Sanov was still employed at Barrett Burke.  However, at the hearing on August 10, 2007,
Sanov testified that Barrett Burke had fired her on March 20, 2007 due to her conduct in *In re Allen*, 2007 Bankr. LEXIS
2063 (Bankr. S.D. Tex. June 18, 2007).  [Aug. 10, 2007 Hr'g Tr. (afternoon session) 116:13-22.]

equity in his homestead of $8,653.21; (2) total post-petition arrearages of $2,255.07; and (3) total

arrearages (both and pre- and post-petition) of $6,969.92.  [Docket No. 26.]

Sanov testified that prior to the preliminary hearing scheduled for January 23, 2007, counsel

of record for the Debtor, Chris Morrison (Morrison), left a message for Sanov's colleague at Barrett

Burke, Chris Reilly (Reilly), to the effect that the Debtor had in fact made the November 2005

payment which Barrett Burke alleged was part of the post-petition defaults.  [March 5, 2007 Hr'g

Tr. 31:7-16.]  Sanov admitted that this payment was in fact made by the Debtor but mistakenly

applied as a pre-petition rather than a post-petition payment. [March 5, 2007 Hr'g Tr. 36:22-37:25.]

Sanov also testified that contrary to the loan repayment history, the Debtor did in fact make a full

payment in May 2006.  She conceded that she had made a mistake in reviewing the loan history prior

to filing the Motion. [March 5, 2007 Hr'g Tr. 38:1-14.]

Finally, Sanov testified that whenever McCalla Raymer referred a Countrywide file to Barrett

Burke, the attorneys at Barrett Burke never dealt directly with Countrywide and, indeed, had no

ability to contact Countrywide directly with regard to the accuracy of a loan history. Rather, Barrett

Burke dealt solely with McCalla Raymer. [March 5, 2007 Hr'g Tr. 23:11-18.]  The Court was

concerned that a law firm would contractually obligate itself to be precluded from any and all

communication with its actual client.[6]  This issue is one of the new issues which this Court raised

in the Second Show Cause Order.

---

[6]  The written agreement that McCalla Raymer has with its local counsel throughout the country, including
Barrett Burke, states that: "All communications must be made through your McCalla contact at our office.  We require
responses to your inquiries within 24 hours and will hold your office to the same standard." [Barrett Burke Exhibit No.
4A.]

11

### 2.    Lois Ortiz's testimony

Ortiz has been the manager of Countrywide's bankruptcy department for over two and a half years and has over twenty years of experience in the mortgage lending industry. [March 5, 2007 Hr'g Tr. 51:18-52:5.] Ortiz testified that no Countrywide employee reviews pleadings before they are filed; rather, Countrywide relies entirely on its attorneys to ensure that the pleadings being filed on its behalf are accurate based upon information provided by Countrywide. [March 5, 2007 Hr'g Tr. 69:9-70:13.] Additionally, she stated that no one at Countrywide reviewed the loan history attached to the Motion prior to its filing. [March 5, 2007 Hr'g Tr. 68:12-24.]

Ortiz also conceded that Countrywide did not give credit to the Debtor for the post-petition payment that he made on November 9, 2005 because Countrywide believed the filing date was November 15, 2005—in Ortiz's own words, "We did not know about the bankruptcy until November 15th. And during that process, it was not acknowledged that the November payment was received as a post-petition payment." [March 5, 2007 Tr. 58:9-12.] She also conceded that the payment history attached to the Motion failed to reflect that the Debtor made a complete monthly payment on May 5, 2006. [March 5, 2007 Hr'g Tr. 71:9-19.]

Finally, Ortiz testified that Countrywide's policy is that if it withdraws a pleading, Countrywide does not assess to the borrower any attorney's fees incurred by Countrywide in the drafting and prosecution of the pleading prior to its withdrawal. [March 5, 2007 Hr'g Tr. 71:20-72:20.] Despite Ortiz's testimony on this issue, the Court was concerned that Countrywide did not have an actual written policy against charging debtors for withdrawn motions. This is another issue which the Court raised in the Second Show Cause Order.

### 3.  John Schlotter's testimony

Schlotter has been an associate attorney at McCalla Raymer for 10 years and has been licensed to practice law for 28 years. [March 5, 2007 Hr'g Tr. 75:24-76:10.] He testified that one of his duties is to ensure that referrals such as the one in the case at bar are sent to the appropriate local counsel in the state where the bankruptcy is filed. [March 5, 2007 Hr'g Tr. 76:11-21.] The Court was surprised by Schlotter's testimony that he was the attorney-in-charge of the Debtor's file. [March 5, 2007 Hr'g Tr. 90:25-91:6.] Although he testified that he was the attorney-in-charge, Schlotter also testified that he had not filed a notice of appearance, had never read the Local Rules for the Southern District of Texas, and had not reviewed the Motion before it was filed. [March 5, 2007 Hr'g Tr. 91:7-92:14; 95:4-22.] The Court was further surprised by Schlotter's testimony that Barrett Burke's client in the case at bar was McCalla Raymer, not Countrywide, and that McCalla Raymer directs Barrett Burke on how any file, including the file in the case at bar, is to be handled. [March 5, 2007 Hr'g Tr. 78:6-14; 93:8-94:6.]

With respect to the payment history attached to the Motion, Schlotter testified that his firm's paralegal staff prepared this history "[a]nd the reason they're prepared this way is because we've had different courts require legible payment histories. And when we submitted screens, we've got courts that have rejected them. And other courts have said, 'We can't read these. We want something that's legible, that shows exactly how the payments are applied, that somebody who doesn't have an accounting background can read it.'" [March 5, 2007 Hr'g Tr. 80:25-81:7.] Schlotter testified that no attorney at McCalla Raymer reviews the loan histories prepared by the paralegals. [March 5, 2007 Hr'g Tr. 96:1-97:5.]

13

Schlotter also testified that he became aware of the errors in the Debtor's payment history when he received a call from Thurmond, who told him that the Debtor had filed a response opposing the Motion and that there were some discrepancies in the payment history. [March 5, 2007 Hr'g Tr. 90:15-19.] Based upon this information from Thurmond, Schlotter personally authorized Thurmond to withdraw the Motion. [March 5, 2007 Hr'g Tr. 88:19-21.]

Finally, Schlotter testified—just as Sanov had—that any communications from Barrett Burke must be directed to McCalla Raymer, not Countrywide. [March 5, 2007 Hr'g Tr. 79:11-20; 99:18-100:6.] Indeed, he stated that if Barrett Burke were to contact Countrywide directly without going through McCalla Raymer, it would be a problem: "It can be [a problem]. It usually is . . . Because, pursuant to agreement with local counsel, the reason that Countrywide would hire us is because it wants to deal with one firm. It doesn't want to have 50 firms calling it on every case that it handles in the country. So it asks that all communication goes through our office." [March 5, 2007 Tr. 94:21-95:3.] The Court was concerned that Countrywide has insufficient lines of communication with those attorneys throughout the country who are representing Countrywide in the courtroom.

## C.     The Court's concerns arising from the March 5, 2007 hearing

Based upon the testimony of these three witnesses, the Court had further concerns about the activities of Barrett Burke, McCalla Raymer, and Countrywide in connection with the filing of the Motion. Two of these concerns have already been discussed above: (1) Barrett Burke's contractual obligation to refrain from any and all communication with Countrywide; and (2) Countrywide's lack of a written policy against charging debtors for withdrawn motions. Third, the Court was concerned as to why Schlotter testified that he was the attorney-in-charge when Sanov signed the Motion and

14

Schlotter did not file a notice of appearance or review the Motion prior to its filing.[7]  Fourth, Sanov

and Schlotter both testified that McCalla Raymer was the client of Barrett Burke; yet, the Motion

represented that Barrett Burke was the attorney for Countrywide, not McCalla Raymer.  Finally,

Sanov, Ortiz, and Schlotter all testified that the loan payment history contained several inaccuracies,

and Schlotter testified that it was Thurmond who informed him of these errors.  Yet,  when this

Court had asked Thurmond on February 6, 2007 if the Motion contained inaccurate allegations, he

represented to this Court that "from what I read in our system this morning, and from what I could

tell from this, the answer is it was a good motion."  [Feb. 6, 2007 Tr. 5:8-10.]  Accordingly, this

Court decided to issue the Second Show Cause Order to obtain clarification of these various issues.

## IV.    The Second Show Cause Order

After reviewing the transcript of the March 5, 2007 hearing, the Court issued a second show

cause order (the Second Show Cause Order). [Docket No. 57.]  The Second Show Cause Order set

forth that the Court was concerned about the following issues: (1) why Thurmond expressly

represented to this Court that the Motion was "good" when Sanov, Ortiz, and Schlotter all testified

that the pay history attached to the Motion failed to account for the Debtor's November 9, 2005 and

May 6, 2006 payments, and when Schlotter himself testified that he learned about these errors from

Thurmond; (2) the language in paragraph 16 of McCalla Raymer's referral guidelines prohibiting

Barrett Burke—or any firm retained by McCalla Raymer—from communicating directly with

Countrywide; (3) Schlotter's confusing testimony that Barrett Burke's client was McCalla Raymer,

not Countrywide, and that he was the attorney-in-charge despite neither signing the Motion nor filing

---

[7] Local Rule 11.1 of the United States District Court of the Southern District of Texas states: "On first appearance through counsel, each party shall designate an attorney-in-charge. Signing the pleading effects designation." The District Local Rules are made applicable to all bankruptcy court proceedings by Bankruptcy Local Rule 1001(b).

15

a notice of appearance; and (4) whether Countrywide really did have a written policy not to assess a borrower any attorney's fees incurred in the drafting and filing of a motion to lift stay when that motion is later withdrawn due to inaccurate allegations. [*Id.*]

Based upon a motion of the UST, the Court continued the scheduled June 26, 2007 hearing until July 27, 2007. [Docket No. 105.] The number of witnesses and scope of examination in connection with the Second Show Cause Order far exceeded the Court's original expectation. In addition to the July 27, 2007 hearing, the Court held four more days of hearings in August on the Show Cause Orders.[8] There were too many witnesses and too much testimony to address the hearings chronologically in this Memorandum Opinion. Instead, the balance of this Memorandum Opinion is organized by issue: first, the specific issues raised in the Second Show Cause Order; and second, the miscellaneous issues that came to light during the hearings within the context of the parties' general conduct related to the Motion as raised in the First Show Cause Order.

### A.   Why did Thurmond represent to the Court that the Motion was a "good motion?"

On direct examination by Barrett Burke's attorney, Thurmond conceded that when he went to the courthouse on February 6, 2007, he knew that the payment history attached to the Motion was incorrect with respect to the November 9, 2005 and May 6, 2006 payments.[9] [July 27, 2007 Tr. 350:15-19.] Thurmond was asked why, when this Court asked him at the February 6, 2007 hearing

---

[8] The Court also held a hearing on October 29, 2007 and heard closing arguments on December 12, 2007.

[9] On cross-examination, Thurmond stated that he was unaware that the payment made on December 13, 2006 was not reflected in the payment history attached to the Motion. [July 27, 2007 Tr. 365:3-8.] The Court is skeptical of this testimony in view of the fact that Thurmond had an attorney worksheet with him when he appeared at the February 6, 2007 hearing. This worksheet expressly stated that the Motion needed to be withdrawn because the Debtor had, in fact, made payments on November 9, 2005, May 5, 2006, and December 13, 2006. [Barrett Burke Exhibit No. 31.]

whether there were any allegations in the Motion that were factually inaccurate, he represented that

the Motion was a "good motion."  Thurmond responded:

> "In the context of all the work that I have ever done going back to 1984 . . . if there's
> a default and there's minimal equity, that's grounds for a motion for relief.
>
> In this case, I looked in the system notes that were part of the database and saw that
> the payoff was in excess of $59,000.  If you use the value that the Debtor had put on
> his schedules, the $65,000, and you look to the net realizable net equity after taking
> out hypothetical closing costs, they probably had no equity.  If you looked at the
> Harris County website appraisal, I think it was only, like, $48,000 or $49,000 so that
> if I was going to try that one, I would want to try to reconcile the two valuations.  If
> you went with the Harris County Appraisal District value and they were clearly in a
> position of no equity, they were, I believe, undisputedly behind by a month and then
> on February 6th, they're behind two more months.  And probably every place that
> I've ever worked, that would be a good motion.  It would have been one that I felt
> like I could prosecute and win . . .
>
> My frame of reference when I was looking through all this information was whether
> or not it complied with Rule 11—or 9011.  Was it based on facts that supported the
> argument that was being presented in the Motion?  It was a valid, prosecutable
> motion . . . "

> [July 27, 2007 Tr. 353:1-21, 353:25-354:4.]

Thurmond's answer is disingenuous.  This Court did not ask Thurmond whether the Motion

was a "valid, prosecutable motion."  Rather, this Court expressly asked him the following question:

"Okay. I guess what I'd like to know Mr. Thurmond, is when the motion was filed, are the

allegations in the motion just flat-out wrong?"  [Feb. 6, 2007 Hr'g Tr. 4:2-7.]  Thurmond's answer

on February 6, 2007 that it was "a good motion," and his subsequent explanation of that answer at

the July 27, 2007 hearing,  artfully dodges the subject of the Court's inquiry—whether the Motion

contained factual inaccuracies.  Thurmond knew full well that the payment history attached to the

Motion did not account for the November 9, 2005 payment or the May 6, 2006 payment, and that

therefore the allegations in the Motion concerning the defaults and post-petition arrearage were, in

fact, "flat-out wrong." Indeed, under cross examination by the UST, Thurmond conceded that he knew about the errors in the Debtor's payment history when he came to court on February 6, 2007. [Aug. 10, 2007 Hr'g Tr. (afternoon session) 46:11-47:9.]

Moreover, this Court has no doubt that Thurmond knew about these problems with the payment history because Schlotter convincingly testified that "I got involved in this case either a day or two before the final hearing on the motion for relief in February of 2007, when I got a call from Walter Thurmond at Barrett Burke telling me that there were some discrepancies with the payment history, and it didn't appear that the debtor was now more than 60 days delinquent in his recommendation. And he asked for my consultation on it and an agreement that we would withdraw that motion."[10] [Aug. 8, 2007 Hr'g Tr. 13:16-23.] Indeed, Schlotter had a distinct and credible recollection of a conversation with Thurmond the day *before* the February 6, 2007 hearing:

| | |
|---|---|
| The Court: | All right. Let's go through that. Did you call Mr. Thurmond or did Mr. Thurmond call you? |
| Schlotter: | He called me. |
| The Court: | All right. Morning or afternoon, if you remember? |
| Schlotter: | I'm trying to remember, but I think—I don't know for sure, but it seems like it was sometime close to lunch. |
| The Court: | And do you recollect what Mr. Thurmond told you? Tell me everything he told you. |
| Schlotter: | He said, 'John, I think this one, there's a problem with the loan history, and the debtor is saying that they made more payments, and I got a history from the client showing that there were payments that weren't reflected, and if he's correct, then the loan isn't as far delinquent as we said in the motion. So, you |

---

[10] Schlotter's testimony that the Debtor was not more than 60 days delinquent refers to a Fannie Mae guideline setting forth that no motion to lift stay should be filed unless the debtor is at least 60 days delinquent (i.e. has failed to make two monthly payments). *See* Sec. IV.E.5 *infra*.

know, it's a Fannie Mae loan, but it's not 60 days delinquent. Assuming the debtor is correct in his assertions, I think we should withdraw this, and I'd like to do that.'

The Court:   Okay.  And what did you say?

Schlotter:   I said, you know, I talked to him.  I asked him what were the problems on the history, and he told me basically that there was misapplied pre- or post-petition payment, and that there was an annual statement that went out to the debtor that showed receipt of a payment. No, that was after the fact. There was one, I think a May payment or something had not been applied properly, so that would have been two payments, which meant that at that point, then, the debtor was probably only one month behind.  And I agreed with him that it was a good idea we should withdraw it instead of pursuing it.

The Court:   So, are you telling me that Mr. Thurmond was knowledgeable about payment problems?

Schlotter:   When he spoke to me, he was, yes.

[Aug. 8, 2007 Hr'g Tr. 70:2-71:11][11]

Thurmond also acknowledged that he had the attorney worksheet for the Debtor's file in his possession when he came to court on February 6, 2007, and that he read this attorney worksheet prior to attending that hearing.[12]  [Aug. 10, 2007 Hr'g Tr. (afternoon session) 31:3-7; 46:1-4.]  The attorney worksheet contained the following paragraph:

Please submit the [agreed order withdrawing the Motion].  This is the second hearing on this matter and a response has been filed in opposition.  We had a signed [agreed order] on this file and then right before the first hearing the [Debtor's attorney] provided proofs of payments and informed us that the first payment the debtor made post petition was applied as a pre petition payment.  This payment was

---

[11] Schlotter's recollection of his telephone conversation with Thurmond was vivid and very credible even though, as is subsequently discussed herein, Schlotter's testimony on a variety of other issues was muddled and, in some instances, simply incorrect.

[12] The attorney worksheet is a document internally generated within Barrett Burke. This document contains a summary of information relevant to a certain hearing, including basic information such as the time, location, and name of opposing counsel as well as instructions for the attorney making the appearance. The entire instruction portion of the attorney worksheet is comprised of the above-quoted paragraph. [Barrett Burke Exhibit No. 31]

19

applied on 11/09/2005 in the amount of $684.62 and has now been reversed from pre petition and reapplied to the 11/01/2005 post petition payment. Also the debtor provided a copy of a transactional history that they received from Countrywide which showed that they made a payment [in the amount of] $751.69 on 5/5/2006 that was not listed on Countrywide post petition history as well as a payment [in the amount of] $751.69 on 12/13/2006. These payments have now been applied correctly and we have found that the loan was post petition due for 12/01/2006 with money in suspense when we filed the [Motion] on 12/29/2006 and this is why we are withdrawing [the Motion]. The loan is still past due for 12/01/2006. Yvonne Knesek and Chris Reilly approved the withdraw and the [Debtor's attorney] is aware we are withdrawing.

[Barrett Burke Exhibit No. 31.]

Because Thurmond admitted reviewing these notes prior to the February 6, 2007 hearing, he knew that the Motion contained allegations that were factually inaccurate and that, therefore, the Motion needed to be withdrawn.[13]

Aside from the attorney worksheet, Barrett Burke also created a document known as the "Bankruptcy Case Comments." [Barrett Burke Exhibit No. 3.] This document contained several comments indicating that the Debtor had provided proof of payments that the Motion alleged had not been made. Most important of these comments was the one made on February 5, 2007 (i.e., the day before the final hearing) by a legal assistant named Sabrina LaPell, the same legal assistant who prepared the attorney worksheet: "[talked to] Chris R. [i.e., Chris Reilly] and YK [i.e. Yvonne Knesek], per YK we need to get approval to [withdraw] this MFR b/c after confirming a [payment] was [received] on 12/13 this would mean that the loan was post [sic] due for 12/1/06 when we filed

---

[13] It is also worth noting that the Debtor was not in sufficient default for the Motion to have been filed under the Fannie Mae guideline which requires two missed monthly payments before filing a motion to lift the stay. [Aug. 10, 2007 Hr'g Tr. (afternoon session) 21:14-22:19.] Thurmond was well aware of this Fannie Mae guideline at the time he represented to this Court the Motion was a "good motion." Moreover, John Smith, the Countrywide representative, testified that if he had been asked whether he would authorize the filing of the Motion, he would have said, "without question, don't file it . . . because it did [not] meet the guidelines that we have set forth to file a Motion for Relief in that instance." [Aug. 9, 2007 Hr'g Tr. 260:20-24.]

the MFR on 12/29." [Barrett Burke Exhibit No. 3, pg. 2.]  These comments leave no doubt that Knesek knew of the errors in the Motion.  Therefore, Thurmond, who testified that he spoke with Knesek prior to going to court on February 6, 2007 [Aug. 10, 2007 Hr'g Tr. (afternoon session) 34:2-35:13], had to have known that the Motion contained inaccurate factual allegations.

As a final note on the issue of Thurmond's misrepresentation that "it was a good motion," the Court asked several witnesses what would have been their response had they been standing in Thurmond's place at the February 6, 2007 hearing when the Court inquired about the factual inaccuracies in the Motion.  Although hindsight is 20/20, their answers are telling.

Mary Daffin, the Barrett Burke partner in charge of the bankruptcy department, responded to this hypothetical as follows:  "If you had asked me if it contained inaccurate factual allegations, I would have told you, yes, sir, it does contain inaccurate factual allegations." [July 27, 2007 Hr'g Tr. 336:15-17.]

The following exchange between this Court and Sanov occurred at the July 27, 2007 hearing:

| | |
|---|---|
| The Court: | Let's assume you had come [to the February 6, 2007 hearing]. |
| Sanov: | Okay. |
| The Court: | And you had gone up to the podium and said [just like Thurmond did] "Judge, we want to withdraw the Motion."  And let's assume I said to you, "why?"  What would you have said? |
| Sanov: | I would have said that a mistake was made on the pay history and that the loan was not sufficiently delinquent when the Motion was filed. |
| The Court: | And if I had said to you, "You mean you're telling me that the Motion to Lift Stay contains factual allegations that are not true," what would your answer have been? |
| Sanov: | I would have said that I now know that they are not true. |

[July 27, 2007 Hr'g Tr. 221:21-222:10.]

Finally, the following exchange between this Court and Schlotter occurred at the August 8, 2007 hearing:

> The Court:    If I had said, ' Are there allegations in the motion that are incorrect?', what
>                   would you have said to me?
>
> Schlotter:      I would have said, 'It appears that there are, yes.'

[Aug. 8, 2007 Hr'g Tr. 72:25-73:4.]

In addition to the "good motion" misrepresentation, the Court had a second concern about Thurmond's other statements at the February 6, 2007 hearing. After Thurmond told this Court that the Motion was a "good motion," the undersigned judge stated that "what I'm going to do is take a look at the motion myself." [Feb. 6, 2007 Hr'g Tr. 4:14-15.] Thurmond then replied that he would "check when I go back and see what the deal was with it." [Feb. 6, 2007 Hr'g Tr. 4:20-21.] This statement led the Court to believe that Thurmond would return to his office, check with his colleagues to determine whether the Motion contained inaccurate factual allegations, and, if he was incorrect, file a notice with the Court correcting his prior misstatement that the Motion was a "good motion."

Thurmond never reported back to the Court. Indeed, his silence was deafening. At the July 27, 2007 hearing, Thurmond could offer no explanation as to why he did not report back to the Court:

> The Court: Did you check?
>
> Thurmond: Yes, I did.
>
> The Court: Did you get back with the Court?
>
> Thurmond: I did not.

[July 27, 2007 Tr. 374:10-13; *see also* Aug. 10, 2007 Hr'g Tr. (afternoon session) 62:4-23.]

22

Thurmond's concession that he did not report back to the Court underscores his less than commendable view regarding the professional duty that an attorney has to be candid with the Court.[14]

### B.    The policy prohibiting Barrett Burke from communicating directly with Countrywide

Sanov and Schlotter both testified at the March 5, 2007 hearing that Barrett Burke attorneys were not allowed to contact Countrywide, and that all communications must be filtered through McCalla Raymer. The Court was troubled by such an arrangement because it precluded the attorney filing the motion from speaking with the actual client. This issue was included in the Second Show Cause Order and addressed by several witnesses during the later hearings.

Sanov returned to court for a second round of testimony on July 27, 2007. She reiterated her previous testimony that all Barrett Burke communications went through McCalla Raymer. [July 27, 2007 Hr'g Tr. 204:5-15.] She further acknowledged that Barrett Burke had to ask permission from McCalla Raymer to withdraw any pleadings. [July 27, 2007 Hr'g Tr. 191:18-24.]

Reilly also testified on July 27, 2007 about the "no communication clause." Reilly was an attorney at Barrett Burke who handled files involving Fannie Mae loans, including files where McCalla Raymer was national counsel and retained Barrett Burke as local counsel. He was steadfast in his testimony that he was not permitted to communicate directly with Fannie Mae and that he could only communicate with McCalla Raymer. [July 27, 2007 Tr. 47:18-48:14.] He also testified

---

[14] In contrast to Thurmond's nonchalant attitude towards his obligation to correct false statements he made to the Court, Barrett Burke's outside counsel for the show cause hearings, William Greendyke, exhibited the appropriate behavior in such circumstances. Greendyke made an argument in closing based on statements that were objected to and excluded at a previous hearing. During a break in the closing arguments, Greendyke reviewed the record, realized his mistake, and informed the Court of his error. [Dec. 12, 2007 Hr'g Tr. 137:12-22.] Barrett Burke should train its own associates to conduct themselves in the same manner as their outside counsel.

that McCalla Raymer had to give its approval before he could withdraw a motion or enter into an agreed order.[15]  [July 27, 2007 Tr. 48:25-49:8; *see also* 104:15-19.]

Regina Thomas (Thomas) is the managing attorney for McCalla Raymer's bankruptcy department.  Thomas confirmed McCalla Raymer's policy prohibiting local counsel such as Barrett Burke from communicating directly with Countrywide and testified that the purpose of the policy is to ensure that McCalla Raymer keeps apprised of the status of any matter in litigation for which McCalla Raymer is national counsel.  [Aug. 7, 2007 Hr'g Tr. 37:15-25.]  She further testified that Countrywide has never complained to McCalla Raymer about this restriction.  [Aug. 7, 2007 Hr'g Tr. 38:11-13.]  According to Thomas, Countrywide desires this restriction because it does not want the various local firms throughout the country contacting Countrywide for information.  [Aug. 7, 2007 Hr'g Tr. 38:14-39:1.]  Thomas also testified that, pursuant to McCalla Raymer's terms of engagement with Countrywide, McCalla Raymer is not required to monitor post-petition payments made by debtors.  [Aug. 7, 2007 Hr'g Tr. 21:11-19.]

Given that Barrett Burke must communicate only with McCalla Raymer, and that McCalla Raymer is not required to monitor post-petition payments made by debtors, this Court is at a loss to understand how Barrett Burke can possibly comply with Bankruptcy Rule 9011 before filing a motion to lift stay.  This arrangement truly creates a situation where the blind (McCalla Raymer) is leading the blind (Barrett Burke).

In the wake of this Court's Show Cause Orders, McCalla Raymer changed the language of its engagement letters with local counsel so that they now do not expressly prohibit direct

---

[15] This testimony tracks with Schlotter's testimony insofar as Schlotter testified that he personally authorized Thurmond to withdraw the Motion.   [March 5, 2007 Hr'g Tr. 88:19-21.]

communication with the client.  Thomas testified that communication through McCalla Raymer is

now just the "preferred method of communication . . . because again, the foundation of this is that

we're representing the client in the context of the entire case, versus a specific litigated matter. But

its [sic] basically a language change reflects [sic] that in the event that counsel needs to contact the

client, they are permitted to do so.  And then we ask them to notify us what that communication was,

so that we can maintain our records for all communication." [Aug. 7, 2007 Hr'g Tr. 40:8-16; *see

also* 75:14-76:1.]  The Court recognizes that this is an improvement upon the previous outright ban

on communication with the client.  However, the Court remains concerned that local counsel will

still be hesitant to directly contact the client out of the fear that McCalla Raymer will cease sending

files to that local counsel.

### C.    Who was Barrett Burke's client and who was the attorney-in-charge?

### 1.    Who was Barrett Burke's client?

At the March 5, 2007 hearing, Schlotter testified that Barrett Burke's client was McCalla

Raymer, as opposed to Countrywide.  [March 5, 2007 Hr'g Tr. 78:6-14.]  However, Schlotter

recanted that testimony at the August 8, 2007 hearing:

> UST:        Mr. Schlotter, [Countrywide's counsel] asked you [at the March 5, 2007
>             hearing], 'Who is the client for Barrett Burke?' on page 78, line 8.  Let me
>             know when you get there.
>
> (Witness complies)
>
> UST:        She asked you, 'Who is the client for Barrett Burke?' And your answer was,
>             'Well, we would be the client.'  That was your testimony?
>
> Schlotter:  Yes.
>
> UST:        Did you feel rushed in giving that answer?
>
> Schlotter:  Yes.

UST:            You did?

Schlotter:      Yes.

UST:            Why?

Schlotter:      Because I hadn't had time to think it through; because I knew what was going on.  I knew that we had sent the referral for Countrywide, but, as I said, and I'll say it again, our office retained Barrett Burke.  Countrywide did not retain Barrett Burke.  Our office retained Barrett Burke on behalf of Countrywide, and we were the contact with Barrett Burke.  We would pay them for their services.  So, in my mind, they represented Countrywide to file the motion. That's what we asked them to do.  But Countrywide did not hire them; McCalla Raymer did.

UST:            Well, sir, when the Court then followed up on that particular answer, and I'll direct your attention to page 93 of your testimony that day.  Let me know when you get there.

(Witness complies)
. . .

UST:            Okay.  The Court followed up at line 8 on page 93; 'I thought I heard you testify when Ms. Madan [Countrywide's counsel] was asking you questions, that you said your firm was the client of Barrett Burke. Is that correct?' Answer: 'That's correct.'  Did you not have enough time the second time you were asked that question?

Schlotter:      Apparently not, because my mind was still based on the same thoughts that our office hired Barrett Burke, and we paid Barrett Burke.

UST:            Well, the Court then followed up again.  The third time you've been asked this question, at line 13: 'And that's your understanding?'  Answer: 'That's my understanding.'  Three times you were asked the question, 'Who was the client,' and three times you said, 'McCalla Raymer.'  Is that correct?

Schlotter:      That's correct.  And if you'll go on, and the Court asks more questions about that, and I think that's where I confused it more.

UST:            So, it was only because of the Court's persistence that you answered—you kept answering differently instead of telling the truth the first time? Is that what you're saying?

(Witness reviews the transcript)

26

Schlotter:      Well, that's what I said.

UST:            How many times do you have to be asked the same question to give you
                enough time to tell the truth?

Schlotter:      That's a question I can't answer.  I guess it depends on what I understand of
                the question.  I certainly didn't intend to mislead the Court, and I don't at this
                point intend to mislead the Court, but I certainly want to clarify what
                happened.

[March 5, 2007 Hr'g Tr. 43:2-45:14.]

After all was said and done, this Court has no doubt now that everyone understands that

Barrett Burke's client is Countrywide.  It is disconcerting that Schlotter, an attorney with 28 years

of experience, would think otherwise.  His initial testimony underscores the need for McCalla

Raymer to properly train its attorneys.

### 2.      Who was the attorney-in-charge?

District Court Local Rule 11.1 of the Southern District of Texas requires each party to

designate an attorney-in-charge, and signing the first pleading for that party is effective designation.

Local Rule 11.2 states: "The attorney-in-charge is responsible in that action for the party.  That

individual attorney shall attend all court proceedings or send a fully informed attorney with authority

to bind the client."

On July 27, 2007, Sanov testified that she was definitively the attorney-in-charge of the

Debtor's file under Local Rule 11.2.  [July 27, 2007 Hr'g Tr. 201:2-11.]  This testimony directly

contradicts Schlotter's testimony at the March 5, 2007 hearing that he was the attorney-in-charge of

the Parsley file.  [March 5, 2007 Hr'g Tr. 90:25-91:3.]  However, when Schlotter took the stand

again on August 8, 2007, he recanted this testimony:

MR's Attorney:      At the time you answered [the UST's] questions [on March 5,
                    2007] and the Court's follow up question, were you aware that the

27

| | |
|---|---|
| | phrase 'attorney-in-charge' had special significance under the Local Rules in the Southern District of Texas? |
| Schlotter: | No, I was not. |
| MR's Attorney: | Have you since read the Local Rules of the Southern District of Texas? |
| Schlotter: | Yes, I have. |
| MR's Attorney: | Are you, under those Rules, the attorney-in-charge of the Parsley matter? |
| Schlotter: | No. |
| MR's Attorney: | Did you sign the initial pleading, the motion for relief filed in the Parsley matter that brings us down here today? |
| Schlotter: | No. |
| MR's Attorney: | Were you designated as the attorney-in-charge under the Southern District of Texas Local Rules? |
| Schlotter: | No. |
| MR's Attorney: | Did you mean to answer to the Court and to [the UST] that you were the attorney-in-charge under the Local Rules in the Southern District of Texas? |
| Schlotter: | No, I did not.  I did not comprehend the concept because I hadn't read the Local Rules. |

[Aug. 8, 2007 Hr'g Tr. 17:14-18:10.]

Thomas testified that Barrett Burke was the "lead counsel for the Motion for Relief in the Southern District of Texas." [Aug. 7, 2007 Hr'g Tr. 42:16-17.]  Her testimony conflicted with Schlotter's testimony at the March 5, 2007 hearing when he testified that he was the attorney-in-charge.  That two seasoned attorneys at McCalla Raymer can have such a difference of opinion on this important point once again underscores the lack of training at McCalla Raymer.

28

Daffin correctly testified that Sanov was the attorney-in-charge pursuant to District Court Local Rule 11.2 because Sanov signed the Motion. [July 27, 2007 Hr'g Tr. 339:12-340:19.] Daffin further stated that this Local Rule requires the attorney-in-charge to appear at a hearing or to send an attorney who is fully informed and with authority to bind the client. [*Id.*] She also stated that it was therefore acceptable for Thurmond, as opposed to Sanov, to appear at the February 6, 2007 hearing so long as Thurmond was fully informed and had authority to bind Countrywide. [*Id.*]

The Court agrees with Daffin's testimony and interpretation of Local Rule 11.2. However, her testimony places her firm in an awkward position. If Thurmond was fully informed about the Parsley file, which this Court believes he was, then he knowingly made a misrepresentation to this Court while an associate at Barrett Burke. The alternative explanation of his misrepresentation to this Court— that the Motion was a "good motion"—is that he lacked full knowledge of the file, which would put him in violation of Local Rule 11.2. Under these circumstances, Sanov, the attorney-in-charge and also an associate at Barrett Burke, would have sent another attorney from Barrett Burke, i.e. Thurmond, to the hearing without full knowledge of the file. This scenario means that both Sanov and Thurmond would have been in violation of Local Rule 11.2, and, as associates at Barrett Burke, their actions are imputed to the firm. *See Religious Tech. Ctr. v. Liebreich*, 98 Fed. Appx. 979, 988 n.30 (5th Cir. 2004) (imposing sanctions under 28 U.S.C. § 1927 jointly and severally against attorneys and their law firm).

**D.    Does Countrywide have a policy not to assess the borrower any attorney's fees and costs for filing a motion to lift stay when Countrywide later withdraws the motion due to its own errors or the errors of its counsel?**

Both Ortiz, at the March 5, 2007 hearing, and Smith, at the August 8, 2007 hearing, testified that Countrywide does not charge borrowers in bankruptcy for any attorney's fees and costs incurred

by Countrywide  in connection with any motion to lift stay that is subsequently withdrawn by Countrywide; however, they also conceded that Countrywide has never committed this policy to writing. [March 5, 2007 Hr'g Tr. 71:24-72:20; Aug. 8, 2007 Hr'g Tr. 134:16–135:14.] In the case at bar, Countrywide did *not* reclassify the fees and costs associated with the Motion as non-recoverable until *after* this Court issued the First Show Cause Order.  In spite of Countrywide's alleged unwritten policy of not charging debtors for fees related to motions that are withdrawn due to Countrywide's errors, Countrywide was charging those fees to the Debtor until the Court raised the issue.

Ortiz testified as follows about Countrywide's practice of waiting until the time of discharge to determine whether fees are recoverable from borrowers/debtors:

| | |
|---|---|
| BB counsel: | At some point in the bankruptcy case, is there a reconciliation of discrepancies in the accounts? |
| Ortiz: | Yes. |
| BB counsel: | When does that happen? |
| Ortiz: | That generally happens when the loan is discharged— |
| BB counsel: | Okay. |
| Ortiz: | —and the case is completed and a thorough review of all transactions and fees are done to determine and make sure that the POC has been paid in full, that if there has been any actions on the case that the fees that have been assessed are proper and that we are abiding by any either court orders or if something was withdrawn, that we have, you know, properly reassessed those fees. And then it is also then reviewed and audited by the team leader before it gets sent on to the next stage. |
| BB counsel: | Okay. So at the end of a bankruptcy case, in this case, a Chapter 13 discharge, successful completion of the plan, that process is done to the file and are reconciliations or eliminations of erroneous charges made at that time? |
| Ortiz: | They can be, yes. |

BB counsel:   Okay.  Assuming there is an erroneous charge, is that the case—

Ortiz:          Assuming, yeah.

[Aug. 10, 2007 Hr'g Tr. 34:10-35:10; 36:13-37:4.]

Smith also testified that the charges related to the Motion will be removed only when the

Debtor receives his discharge:

UST:   This $550 was part of the fee that Countrywide had assigned to Mr. Parsley for the
filing of the withdrawn Motion for Relief from Stay; was it not?

Smith: That's correct.

UST:   And then there's the $150, which was the court costs for the filing of that withdrawn
Motion for Relief from Stay, correct?

Smith: That's correct.

UST:   And we see two entries again on March 12th, 2007.  And the last entry on March 12th
after all the reclassification has been done, what is the balance on Mr. Parsley's
account for the fees he owes to Countrywide?

. . .

Smith: Twelve thousand sixty or, I'm sorry, $1,260.53 would be the balance.  Now, but did
you say that would be owed by Mr. Parsley?

UST:   Isn't that what the balance shows?

Smith: Well, no, not directly.  That would be the balance that would be in the fees due.
However, again, that would not be chargeable because it's been reclassified.  So once
the loan was completed it would actually be—it would go through a process we call
"book loss" to actually book the fees off of the loan.

UST:   Why is [sic] there two entries on March 12th as debits in the amount of $550 and
$150?  Why do you debit it, which increases the balance total back to what it was
before you re-classed these fees for the withdrawn Motion for Relief from Stay?

Smith: Again, it's—it would be an internal accounting function.  Again, that's part of the
book loss process that I spoke about before.  But it would be reclassified, so Mr.
Parsley would not have been charged for that.

UST:   But the running balance reflected in your system has it the same amount, correct?

Smith: It has a running total of the same amount. But, again, it's being reclassified to a non-claimable amount. So when the loan is completed we book that item off of the system. It's just an accounting function.

UST: Mr. Parsley's loan is a 30-year loan, correct?

Smith: That's correct.

UST: So in 2029 someone at Countrywide is going to remember to go back and book loss this amount?

Smith: No. Actually, this would occur—in this case in the bankruptcy context we would book loss the loan as soon as—typically, as soon as it would come out of the bankruptcy environment.

. . .

UST: Where on Countrywide's system would the balance be reflected that Mr. Parsley owes?

Smith: He would have to—and I'm not aware if you can create a report to show, to just pull out the recoverable items. But you would have to add up those items that were fees due and showing as in a code that would be owed by the borrower.

UST: So Mr. Parsley has to hope that five years or so from now when his Plan ends someone from Countrywide is going to go back and do this math correctly?

Smith: Well, we have a book loss department within the finance group that actually is responsible for doing just that.

UST: But Countrywide can't even get it right when it files an Amended Proof of Claim a month later from reclassifying these fees as non-recoverable, correct?

Smith: Again, the Amended Proof of Claim was filed without direct correspondence, communication as to what was going to be revised at that time for the Amended Proof of Claim.

[Aug. 8, 2007 Hr'g Tr. 256:9-260:1.]

The Court cannot understand why Countrywide does not determine whether the debtor is

charged with the fees and costs *at the time the motion is withdrawn* rather than at the time the debtor

receives a discharge—which can be several months, if not years, after the withdrawal of the motion.

[Aug. 8, 2007 Hr'g Tr. 138:9-20.] Smith wants this Court to believe that, in the case at bar, when

32

the Debtor receives a discharge two and a half years from now, Countrywide will ensure that the fees and expenses associated with the Motion will not be charged to him.[16]  Given the myriad of errors in the case at bar, the Court doubts Countrywide would take such action.  Indeed, Smith conceded that Countrywide would not have even thought about refraining from imposing these fees and costs on the Debtor if this Court had not issued the First Show Cause Order. [Aug. 8, 2007 Hr'g Tr. 263:9-14.] Left unanswered is the question of what happens if the Debtor's Chapter 13 case is dismissed.  Since those fees have not been written off and still appear on the account, there is nothing to stop Countrywide from reclassifying those fees back to the  "recoverable" category and charging them to the Debtor.

If a written policy actually existed stating that Countrywide would not charge debtors for fees and costs associated with its withdrawn motions, then that policy should demand that the charge be reclassified *immediately* after the motion is withdrawn.  A Countrywide employee should not need to determine the status of those fees several months or years later.  This reluctance, if not refusal, to immediately reclassify these fees as unrecoverable has called into question whether Countrywide had any such unwritten policy when Ortiz and Smith testified in August of 2007; or, if such a policy existed, whether Countrywide did anything to properly enforce it.

During closing arguments on December 12, 2007, counsel for Countrywide addressed the Court's concern over Countrywide's failure to commit to writing a policy stating that it would not charge debtors for motions to lift stay that are later withdrawn due to Countrywide's error.  Counsel informed the Court that, as a result of the show cause hearings, Countrywide now had a policy in

---

[16] The Debtor's Chapter 13 plan was confirmed on February 27, 2006. [Docket No. 23.] Thus, because his plan is a 54 month plan, he will receive a discharge in August of 2010, i.e. two and a half years from now.

writing to this effect. [Dec. 12, 2007 Hr'g Tr. 67:21-24.] The Court requested to see a copy of this

written policy [Dec. 12, 2007 Hr'g Tr. 74:14-23], and Countrywide submitted a document for *in

camera* inspection on December 14, 2007. After reviewing the relevant language in this document,

the Court does not understand why Countrywide would believe that this document contains a policy

that Countrywide will not charge debtors for fees and costs associated with motions that it withdraws

due to inaccurate factual allegations. What Countrywide submitted is not an instruction or a policy;

it is simply an explanation of how a Countrywide employee would code fees as not chargeable to the

borrower.[17] Nothing has changed. Countrywide may have the ability to code fees as non-chargeable,

but it has not shown this Court a commitment to write off these fees.

     This Court is certainly not going to write Countrywide's policies. However, given the

representation made by Countrywide's counsel, the Court expected a plain and simple sentence

declaring that Countrywide will not charge borrowers any fees related to any motion to lift stay

withdrawn as a result of Countrywide's own errors. Countrywide appears unwilling to take this

basic step towards accepting responsibility for motions which are incorrectly filed based upon its

own errors and the mistakes of its counsel.

     Moreover, Countrywide represented that it has not changed its practice of determining

whether fees are recoverable at the time of discharge. There is no justifiable reason that these types

of fees cannot be *immediately* written off. If Countrywide allows up to five years to pass before

deciding whether to charge a debtor for these fees, it is very likely that a debtor, who may not have

---

[17] Because this document was submitted for *in camera* inspection only, the Court will not directly quote the language to which it refers. Further, in fairness to Countrywide, after it reads this Memorandum Opinion, if it believes that the Court is incorrect, the Court will allow Countrywide to file the document with the Clerk of Court and the Court will amend this Memorandum Opinion to include the verbatim language in the document as an addendum. Countrywide shall have ten (10) days from the entry of this Memorandum Opinion on the docket to file this document with the Court.

the assistance of counsel at that point, will be willing to pay these fees out of a desire to extricate himself from bankruptcy and move on with his life.[18]  When asked why this policy had not been changed, and why Countrywide was still waiting until discharge to make the non-recoverability determination, its counsel responded, "Your Honor, I'm not prepared to answer that question today." [Dec. 12, 2007 Hr'g Tr. 80:23-24.]  Countrywide's unwillingness to put into effect a straight-forward policy and to reconsider when fees are deemed non-dischargeable makes this Court all the more concerned about Countrywide's policies.

### E.    The general conduct of Barrett Burke, McCalla Raymer, and Countrywide in connection with the Motion

The issues discussed above were specifically enumerated in the Second Show Cause Order. Due to the UST's thorough investigation and examination, the Court heard testimony on many other issues regarding miscellaneous conduct of Barrett Burke, McCalla Raymer, and Countrywide which related to the Motion specifically and to their business practices generally.  The Court would be remiss if it failed to address these other issues which in some cases are as, if not more, disconcerting than the ones already discussed above.  Primarily, this analysis is organized around the flow of information through the system created by the parties in this case.   Tracing the steps leading up to the filing of the Motion shows that this is an assembly line process.   There are attorneys involved throughout this process that should be catching these errors.  However, the attorneys, do not dedicate sufficient time and care to ensure adequate quality control.  Eventually, despite being passed through

---

[18] The Debtor's Chapter 13 petition was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Thus, his plan will last only 54 months.  However, with a certain narrow exception, all Chapter 13 cases filed after BAPCPA must last 60 months unless unsecured creditors receive payment in full of their claims.  *See* 11 U.S.C. § 1325(b)(4)(A) and (B).  Accordingly, in most cases, under Countrywide's present policy of deciding whether the fees and costs are recoverable only at the date of discharge, this decision will not be made until five years after the confirmation of the plan.

the hands of several paralegals and attorneys, the Court receives an erroneous motion that should never have been filed.

### 1.   Countrywide's Payment History

This process begins with Countrywide and, ultimately, must end with Countrywide because the actions of McCalla Raymer and Barrett Burke were done on behalf of Countrywide. As Ortiz testified, the mistakes Countrywide made in the Debtor's payment history are the root cause of the Motion being filed. As previously stated, she conceded that Countrywide did not acknowledge the Debtor's bankruptcy filing in their electronic files until several days after he filed and Countrywide had received notice of the filing. [March 5, 2007 Hr'g Tr. 68:12-24.] Thus, the Debtor's post-petition payment on November 9, 2005 was posted as a pre-petition payment, and Countrywide's records indicated that the Debtor missed his first post-petition payment. Although this was not the only mistake in the payment history that the Court eventually received, it was the first.

Ortiz also testified that no one at Countrywide reviews pleadings before they are filed on its behalf, and in this case no one at Countrywide looked at the final payment history attached to the Motion. [March 5, 2007 Hr'g Tr. 68:12-24; 69:9-70:13.] This hands off approach is consistent with the no communication clause between Countrywide and its local counsel, such as Barrett Burke. Countrywide's attitude is that once it has referred the file to national counsel, it does not want to be bothered with any details about the pleadings and proceedings which follow.

Additionally, Smith testified that Countrywide has been asked by courts to clarify the payment histories that it has submitted with motions to lift stay. [Aug. 9, 2007 Hr'g Tr. 197:20-24.]

36

Indeed, he stated that such requests have been "happening more and more frequently."[19] [Aug. 9, 2007 Hr'g Tr. 197:25-198:2.]  The next step in the process is for Countrywide to transmit this inscrutable pay history to McCalla Raymer.

### 2.    Simplified payment histories prepared by McCalla Raymer legal assistants

Thomas testified that, in the spring of 2006, McCalla Raymer "made a business decision to create a separate entity known as MR Default Services, which provided non-legal support services to the law firm."  [Aug. 7, 2007 Hr'g Tr. 23:14-20.]  This new entity employs 300-350 legal assistants formerly employed directly by McCalla Raymer. [Aug. 7, 2007 Hr'g Tr. 163:6-9.] These legal assistants perform the same functions as when they were direct employees of McCalla Raymer. [Aug. 7, 2007 Hr'g Tr. 24:11-18.] The attorneys at McCalla Raymer continue to oversee and control the legal assistants at MR Default Services.  [Aug. 7, 2007 Hr'g Tr. 24:19-21.]  It is these legal assistants who, upon receipt of Countrywide's loan history, create a simplified loan history which the McCalla Raymer attorney delivers to local counsel such as Barrett Burke.  Yet, no attorney at McCalla Raymer ever reviews the simplified loan history for its accuracy.[20] [Aug. 7, 2007 Hr'g Tr. 164:19-165:6.]

According to Thomas, these legal assistants do—to use her words—a "cut and paste" job using the Countrywide loan history [Aug. 7, 2007 Hr'g Tr. 63:23; *see also* 165:18.], suggesting that there is no need for any attorney at McCalla Raymer to be concerned about the accuracy of the

---

[19] Schlotter testified that McCalla Raymer received similar complaints from various courts about the complexity of Countrywide's loan histories.  To use Schlotter's own words, courts want to see a loan history "that somebody who doesn't have an accounting background can read." [March 5, 2007 Hr'g Tr. 81:7.]

[20] If courts throughout the country have complained that Countrywide's original loan histories are too complex to decipher, then attorneys at McCalla Raymer should be reviewing the simplified payment histories that the legal assistants are constructing.

simplified loan histories. Yet, the MR Default Services employee,  LaToya President (Ms. President), who converted the Debtor's loan history from the Countrywide version to the McCalla Raymer version, admitted that she made a mistake in this case.  She testified that when she did the cutting and pasting, she created the inaccurate payment history, not reviewed by an attorney at McCalla Raymer, which was delivered to Barrett Burke.

The following exchange between McCalla Raymer's counsel and Ms. President is telling:

| MR's Attorney: | Okay. What happened here? |
|---|---|
| Ms. President: | In the process of cutting and pasting and deleting, I deleted the mortgagor's [monthly payment] versus the trustee [i.e. the trustee's payment to Countrywide]. |
| MR's Attorney: | Which you had pulled from the webpage; you deleted the wrong— |
| Ms. President: | The wrong— |
| MR's Attorney: | —entry. |
| Ms. President: | Correct. |
| . . . | |
| MR's Attorney: | Is the May 5th payment here at the top of the page, is that the one you deleted in error? |
| Ms. President: | Correct. |
| MR's Attorney: | And the May 8th payment is the one you placed on the payment history in error? |
| Ms. President: | Correct. |

[Aug. 8, 2007 Hr'g Tr. 100:12-18; 101:23-102:3.]

This Court understands that mistakes happen, and it is by no means upset or unhappy with Ms. President.  What this Court does not understand is why Countrywide's original loan payment history is so complex that McCalla Raymer, through MR Default Services, must simplify the history

so that this Court—and other courts— will be able to comprehend the payment history. Is it too much to ask of Countrywide, or any mortgagee or servicer, to generate a payment history that does not have to be simplified by legal assistants who inevitably will make mistakes? Countrywide's payment histories are so complex that judges, attorneys, and borrowers have difficulty understanding them. Indeed, these payment histories are sufficiently confusing that many debtors, and their attorneys, are unable to determine if Countrywide has overcharged them.

### 3. The need for Barrett Burke employees to confirm the accuracy of payment histories pursuant to Barrett Burke policy

The next step on this assembly line is for McCalla Raymer to forward the file to local counsel, which was Barrett Burke in the case at bar. Reilly conceded that when McCalla Raymer referred the Debtor's file to Barrett Burke requesting for Barrett Burke to file a motion to lift stay, the file "fell through the cracks" [July 27, 2007 Hr'g Tr. 55:4-5], and that Sanov, not he, ended up signing the Motion because he was on vacation. Reilly testified that all Barrett Burke employees are supposed to confirm the accuracy of all payment histories prior to the filing of any motion to lift stay, and conceded that Sanov would have been in violation of this Barrett Burke policy if she filed the Motion without doing such a check. [July 27, 2007 Hr'g Tr. 57:12-19 and 57:25-58:3.]

Sanov testified that, between December 11, 2006 (when Barrett Burke received the referral from McCalla Raymer) and December 29, 2006 (when she filed the Motion), neither she nor anyone else at Barrett Burke checked with McCalla Raymer or Countrywide to confirm whether the payment history needed to be updated. [July 27, 2007 Hr'g Tr. 213:20-23.] Had anyone taken the time to check, they would have discovered that the Debtor had made a payment on December 13, 2006.

Since neither Sanov nor Reilly verified the accuracy of the payment history before the Motion was filed, the Court received a motion to lift stay riddled with errors that could have—and should

39

have—been caught by any number of attorneys whose hands it passed through on the way to the docket. Unlike McCalla Raymer, Barrett Burke at least acknowledges that its attorneys bear the responsibility of checking the accuracy of the payment history and deficiencies before filing motions to lift stay. Unfortunately, quality control does not appear to have been a priority at Barrett Burke, and its attorneys filed the Motion without verifying the factual basis underlying this pleading.

### 4.    The proofs of claim filed by McCalla Raymer

Countrywide, McCalla Raymer, and Barrett Burke vociferously objected on grounds of relevancy to the introduction of any evidence about the Countrywide proof of claim, and two amendments thereto, that were filed in the case at bar. The parties argued that neither the First Show Cause Order nor the Second Show Cause Order referenced Countrywide's proof of claim. [Dec. 12, 2007 Hr'g Tr. 25:2-12.]

Yet, Sanov, the Barrett Burke attorney who signed the Motion, testified that "[i]f there are mistakes in the proof of claim, those mistakes were transposed onto the Motion for Relief From Stay." [Aug. 10, 2007 Hr'g Tr. (afternoon session) 86:18-20.] Indeed, Sanov reviewed the proof of claim in preparing the Motion. [Aug. 10, 2007 Hr'g Tr. (afternoon session) 74:4-19.] She testified that she used the proof of claim to determine what figure she should include in the Motion for pre-petition arrears owed by the Debtor. [*Id.; see also* Aug. 10, 2007 Hr'g Tr. (afternoon session) 79:11-16; 80:22-81:1; 83:3-11; 117:2-4.] Thus, the Court concluded that evidence regarding the proof of claim was relevant to the Show Cause Orders because it might help to explain some of the inaccuracies in the Motion. Accordingly, the parties' objections were overruled and the UST proceeded to examine the errors in the proof of claim filed in this case.

40